NOT FOR PUBLICATION                          [Dkt. Ent. 17]

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW JERSEY

## CAMDEN VICINAGE

| | |
|---|---|
| ROBERT SCULL,<br><br>                Plaintiff,<br><br>     v.<br><br>THE WACKENHUT CORPORATION,<br><br>                Defendant. | Civil No. 10-4633<br>(RMB/AMD)<br><br><br>**OPINION** |

Matthew S. Wolf, Esq.
Pappas & Wolf, LLC
423 White Horse Pike
Haddon Heights, NJ 08035

        Attorney for Plaintiff

John K. Bennett, Esq.
Jackson Lewis LLP
220 Headquarters Plaza
East Tower, 7th Floor
Morristown, New Jersey 07960

        Attorney for Defendant


**BUMB**, United States District Judge:

        Plaintiff Robert Scull alleges that his former employer,

The Wackenhut Corporation ("Wackenhut" or "Defendant"), fired

him on account of his age in violation of the New Jersey Law
Against Discrimination ("NJLAD"), N.J. Stat. Ann. § 10:5-1 et
seq., and in retaliation for complaining about safety issues in
violation of the New Jersey Conscientious Employee Protection
Act ("CEPA"), N.J. Stat. Ann. § 34:19-3.  Wackenhut moved for
summary judgment on both claims.  For the reasons that follow,
the Court grants Wackenhut's motion as to the ADEA claim and
denies it as to the CEPA claim.

## I. BACKGROUND[1]

Wackenhut is a security contractor.  It provides services
for power company PSEG at its Salem-Hope Creek nuclear power
facility in New Jersey (the "Facility").  Wackenhut hired
Plaintiff in November 1989, as a security monitor for the
Facility.  During his twenty years at Wackenhut, Plaintiff held
various posts and received only relatively minor disciplinary
actions.  Plaintiff was eventually promoted to the position of
Team Leader for the Delta Team, which covers security for the
night shift.  As Team Leader, Plaintiff was responsible for the
shift, which included making schedules, administering overtime
hours, approving and denying vacation and benefit time, and

---

[1] All background facts are drawn from the affidavits and
depositions submitted by the parties, as well as their
Statements of Material Fact under Local Rule 56.1.  The facts
are construed in the light most favorable to Plaintiff.  See
Kopec v. Tate, 361 F.3d 772, 775 (3d Cir. 2004), cert. den'd,
543 U.S. 956 (2004).

supervising the Assistant Team Leaders ("ATLs").  The Facility has four teams of security personnel, Alpha, Bravo, Charlie, and Delta.  In 2009, the Alpha, Bravo, and Charlie Teams had five supervisors - a Team Leader and four ATLs - as well as a number of security officers.  (Pl.'s Aff. ¶ 4, Dkt. Ent. 22-5.)  Delta Team, however, operated with only three ATLs and sometimes two, when one ATL was absent and the Team could not find coverage. (Id.)

The parties dispute the number of ATLs required to provide sufficient security at the Facility.  According to Wackenhut Director Charles Workman, the minimum staffing level to provide an appropriate protective strategy for the Facility is one Team Leader and three ATLs.  (Workman Dep. 113, Def.'s Ex. C.) Plaintiff believed that even when his team had three ATLs, this was insufficient to ensure proper supervision of the security officers.  (Pl.'s Aff. ¶ 5.)  According to Plaintiff, having only three ATLs on a shift made it difficult if not impossible for the supervisors to complete all of their required tasks. (Id. at ¶ 10.)  An essential part of a supervisor's duties is to ensure that security officers were manning the appropriate posts.  (Id. at ¶ 9.)  Plaintiff contends that with three - and sometimes two - ATLs, his team did not have sufficient time to complete all of these post checks and, as a result, certain posts were left unmanned at times.  (Id. at ¶¶ 5, 9-10.)

Plaintiff also had problems with Wackenhut's procedure for documenting weapons in the Facility's armory.  (Pl.'s Dep. 250.) ATLs were responsible for accounting for all handguns, rifles, and equipment from the prior shift. (Pl.'s Dep. 252.) Occasionally, someone would take a handgun or rifle from the armory, usually for training or testing purposes, without properly documenting it, and Plaintiff would have to spend time tracking down the weapon, which meant time away from the field and less time for his actual job of security oversight.  (White Dep. 24-25, Dkt. Ent. 22-4; Pl.'s Dep. 252-53.)

### Plaintiff's Complaints to Wackenhut Management

Plaintiff brought his concerns about the armory and the shortage of ATLs on his Team to Wackenhut management.  With respect to the weapons documentation issue, Plaintiff first raised his concerns in meetings with other team leaders as well as the Facility's training department and armorers.  (Pl.'s Supplemental Statement of Material Facts ("PSSMF") ¶ 17.) Although the timeline is unclear from the record, at some point PSEG management became aware of Plaintiff's complaints and conveyed those concerns to Wackenhut management.  (White Dep. 28-29.)  According to Plaintiff's supervisor, Stephen White, the problem was fixed for a short period but then went back to the way things had been.  (White Dep. 27.)  Plaintiff raised the issue again, and again it was corrected for a period of time.

4

(Id.)  Ultimately, the responsibility for ensuring proper documentation fell to the training coordinator to discipline the offending officers.  (Id.)  White testified that to the best of his knowledge, this was never done.  (Id. at 27-28.)

Three months prior to his termination, Plaintiff conveyed his concerns about both the armory and staffing issues directly to Wackenhut Director Charles Workman.  (White Dep. 39-41 & 46; Pl.'s Aff. ¶ 24.)  Plaintiff informed Workman that these issues needed to be addressed and that he did not have a problem reporting them, if necessary, to the United States Nuclear Regulatory Commission, which regulates nuclear power plants. (White Dep. 39.)

Plaintiff did not raise his concerns to Workman again prior to his termination.[2]  Wackenhut subsequently added a fourth ATL-in-training, John Calhoun, in September 2009. (Pl.'s Dep. 121;

_____

[2] The Court notes, however, that Plaintiff has proffered an affidavit, which states: "up until I was terminated, I had [sic] brought [these safety concerns] to my employer's attention". (Pl.'s Aff. ¶ 3.)  Plaintiff does not specify, however, to whom he complained; specifically, whether he made these complaints to someone who was not involved in the decision to terminate him, such as his supervisor, White, or to someone who was involved in the decision, such as Workman.  He also fails to specify when he made these alleged complaints; specifically, whether they were before or after the meeting with Workman three months before his termination.  The Court therefore does not infer from this affidavit that Plaintiff raised his concerns to Workman again within the three-month period between the meeting described above and his termination.

Pl.'s Aff. ¶ 11.)  It is unclear from the record whether this action was taken in response to Plaintiff's complaint or not.

### The Checkpoint Incident

On the night of September 12, 2009, a vehicle entered the Facility and failed to stop at a checkpoint.  It belonged to a couple from Salem, New Jersey.  They had gotten lost and inadvertently driven into the Facility while taking their infant on a car ride to help him fall asleep.  A security officer, Bobbi Jo Whitaker, directed the vehicle to stop, at which point the vehicle turned around and proceeded the wrong way down the road.  Whitaker again commanded the vehicle to pull over, at which point it stopped.  Whitaker requested assistance from her supervisors over the radio and asked them to call the local police.  Before back-up arrived, she approached the car and spoke with the couple.  Plaintiff's supervisor with PSEG, Giselle Huckoby, called Plaintiff and told him she did not want the police called until he had checked out the situation. (Pl.'s Aff. ¶ 12.)  Calhoun arrived on the scene to assist Whitaker.  At Plaintiff's request, Calhoun left Whitaker, picked up Plaintiff, and brought him to the scene.  When Plaintiff arrived, he spoke with the driver and his family, determined that they did not pose a threat, and permitted them to leave.

Workman testified that after he learned of the incident, he felt that Plaintiff had mishandled the situation in three ways.

6

(Workman Dep. 31-32, Def.'s Ex. C.)  First, Plaintiff had failed
to report the incident immediately to his superiors or to the
incoming Team Leader at shift turnover.  (Workman Tr. 35-36,
31.)  According to Workman, he received a call from Whitaker one
or two days after the incident, asking him for feedback on her
performance, and he did not know what she was referring to.
(Id. at 37-38.)  Workman called Plaintiff's supervisor, White,
who reported that he did not know about the incident either.
(Id.)  Plaintiff testified that he was required to immediately
inform White of the incident but could not recall whether he had
done so before submitting a written report to him six days later
on September 18, 2009.  (Pl.'s Dep. 152-53.)  Plaintiff notes,
by way of explanation, that he was scheduled off from work for
mandatory training immediately following the incident.  (Pl.'s
Aff. ¶ 15.)  According to White, Plaintiff was not required to
immediately report the incident, but in any event, Plaintiff had
told him about it before giving him the report on September
18th, although White could not recall the exact date.  (White
Dep. 114, Dkt. Ent. 22-4.)

Second, according to Workman, Plaintiff permitted his ATL
to make a "derogatory comment" to Whitaker without any
corrective action.  (Workman Dep. 32.)  After watching the
incident on a closed-circuit television and seeing Whitaker pull
over the vehicle and approach the car without back-up, ATL Eric

7

Boos allegedly stated that he was waiting to see the muzzle of a gun "flash" and Whitaker's body hit the ground.  (DSUMF ¶ 54.) According to Workman, this comment "somehow got back to Miss Whitaker", who complained about it.  (Workman Dep. 48.)  Workman faulted Plaintiff for failing to "correct" Boos.  (Workman Dep. 31.)  Plaintiff avers he was never informed that Boos had made this comment.  (Pl.'s Aff. ¶ 16.)

Third, Workman represented that Plaintiff failed to give Whitaker any feedback on her performance.  (DSUMF ¶ 57; Workman Dep. 32.)  Plaintiff contends that he was unable to give Whitaker detailed feedback because the day after the incident, he was scheduled off from work for mandatory training.  (Pl.'s Aff. ¶ 15.)  In any event, Plaintiff's September 18th report reflects that he "commended" Whitaker for stopping the vehicle.  (Pl.'s Report, Sept. 18, 2009, Def.'s Ex. B.)

Shortly after the incident, the security officers' union brought complaints about the handling of the checkpoint incident to Plaintiff's supervisor, White.  (White Dep. 119.)  On or about September 21, 2009, White informed Plaintiff that Wackenhut was placing him on administrative leave pending an internal investigation into the union's allegations.  (DSUMF ¶ 64; Pl.'s Dep. 156-59.)  Plaintiff responded that he felt the union was harassing him and that he would contact the NRC and Employee Concerns (what appears to be PSEG's human resources

8

department).  (Id. at 160-61.)  Plaintiff never made these complaints, however.  (Id. at 162-63.)

Workman asked Brian O'Connor, a manager at another Wackenhut site, to conduct an investigation into the issues raised by the union, specifically, the manner in which Plaintiff and ATL Boos had treated Whitaker during the checkpoint incident, which had led to broader complaints about Plaintiff, i.e., that he improperly administered overtime, that he hung up the phone on security officers who called him for assistance, and that he spent much of his time in his office listening to Phillies baseball games on the radio.  (DSUMF ¶¶ 68, 70; Pl.'s Dep. 159, 169-232; O'Connor Investigation Report, Ex. D-12 to Def.'s Ex. B.)  O'Connor accepted the request and conducted an investigation into these matters.  (Id.)

O'Connor conducted interviews and filed a report of the investigation with Wackenhut management on October 12, 2009. His report made the following findings:

> When I arrived at Salem Hope Creek, I was introduced to Tony Rizzo the security force union president. Tony informed me of the issues on D shift that were caused by Bob Scull and Eric Boos.  Tony recommended I interview specific officers because he felt they would open up and tell me about their concerns.
>
> . . .
>
> During the interviews of the officers only Shari Stiles had any issues with how overtime was distributed.

Most of the officers I interviewed mentioned [Plaintiff] hangs up on officers when they call him, but couldn't say who the officers were.  Only Shari Stiles said Bob Scull just recently hung up on her.  I believe if I interviewed [the] whole shift I would find other officers that experienced Bob hanging up on them.  Bob Scull denies hanging up the phone on anyone.

. . .

Bob Scull stated he thought Bobbi Jo Whitaker handled the wrong way vehicle incident correctly.  Bob should have told Eric Boos he thought Bobbi Jo took the correct action.  Maybe Eric would have not had said [sic] the things he did to Bobbi Jo.

Bob [Scull] stated the radio with the baseball game plays in the background.  He also states he rarely knows the score.  The officers I interviewed all stated he is always listening to the baseball game. Bob [Scull] said "why would he jeopardize his job over a baseball game."  If the Phillies lose "it's a bad day"[.]  [T]he ATLs joke with Bob about this, but he says it's not true.

All the officers interviewed said there was no notification during briefings on the wrong way vehicle [checkpoint incident] or Officer Gonzalez's medical emergency.  There is a disconnect between supervision and the officers on D shift.  All the officers . . . stated complaints on how Scull and Boos make decisions and how they interface with the officers.  ATL Calhoun went to the checkpoint to support Whitaker.  Scull called Calhoun to go back to the security area to pick him up.  At this point the vehicle occupants were still being questioned by Bobbi Jo[.]  [W]hy would Scull take Calhoun away from the scene when the vehicle was still there?

(O'Connor Report, Ex. D-12 to Def. Ex. B.)

    Plaintiff denies the allegations made by the officers in

O'Connor's report.  (Pl.'s Aff. ¶¶ 21.)  He contends that

O'Connor's investigation was compromised because it only relied

on interviews with the eight officers put forward by the union
(out of the fifty-five officers on his Team).  (Pl.'s Aff. ¶
18.)  According to Plaintiff, these officers were biased against
him, because he had denied their requests for overtime, which
had been made outside the normal procedures.  (Id.)  He disputes
the merits of their allegations, contending that he never did
anything to discourage security officers from bringing issues up
the chain of command.  (Pl.'s Aff. ¶ 17.)

   After reviewing O'Connor's report, Workman decided to
terminate Plaintiff's employment.  (Workman Dep. 24, 59.)
Workman testified that his decision was based on his conclusion
that the way the checkpoint incident had been handled was
symptomatic of how Plaintiff managed his Team.  (Id. at 58.)
Workman testified that he felt the security officers on
Plaintiff's team were afraid to bring their concerns to
Plaintiff, which raised safety issues.  (Id. at 48, 58.)

   Workman prepared an Employee Termination Review form
("Termination Form"), dated October 14, 2009, which set forth
the basis for his decision to fire Plaintiff.  The Termination
Form stated:

> Termination is result of single event as well as
> systemic issues identified during investigation.
> These occurrences happened while TL Scull was acting
> senior shift supervisor.

[1] Scull has on many occasions refused subordinates' help/direction by hanging up telephone

[2] Scull allowed subordinate supervisor to engage in inappropriate counseling behavior towards subordinate security officer during an unauthorized vehicle entry event

[3] Scull was less than truthful during interview, stating he has never been contacted in regards to current investigation (Scull has been verbally counseled on two separate occasions by operations coordinator/acting PM Steve White and once by RSS Director Charles Workman)

[4] Scull did not meet management expectations by failing to respond to an on-shift security medical emergency

[5] Scull did not document or report unauthorized vehicle entry incident to management

[6] Scull continually displays behaviors not conducive to a healthy SCWE (safety conscious work environment)

Scull's termination stems in part from his conduct related to an incident in which an officer followed and pulled over an unauthorized vehicle and confronted its occupants.  Scull exercised faulty judgment by commanding a second officer to leave the first officer alone at the scene of the vehicle stop in order to drive Scull to the scene.  Scull then failed to report the incident when he knew its significance and the disagreement on how it should have been handled. Scull has often displayed a hostile demeanor while dealing with routine issues.  Much of his distraction is perceived by multiple witnesses to result from Scull's repeated and excessive pre-occupation with listening to sports radio during work hours, including Philadelphia Phillies games.  More than one officer reports that when Scull's favored sports team was defeated, Scull's civility with and receptivity to his officers' efforts to discuss work-related issues was markedly diminished and negligible.

(Employee Termination Review, Workman Dep. Ex. 3 to Def.'s Ex. C.)  Notably, Workman clarified in his deposition that Plaintiff's termination resulted not from his handling of the checkpoint incident itself, but from the fact that his conduct during that event was symptomatic of broader problems on his Team, specifically, that officers were afraid to bring their concerns to him.  (Workman Dep. 54, 58.)  On October 23, 2009, Wackenhut Project Manager Charles Hunter Sawders notified Plaintiff that he was terminated.  (Sawders Mem., Oct. 23, 2009, Ex. D-10 to Def.'s Ex. B, Dkt. Ent. 17-2 at p.113.)

Plaintiff's immediate supervisor, Stephen White, testified that he did not believe Plaintiff should be disciplined for his handling of the checkpoint incident, since he was following the direction of his PSEG supervisor.  (White Dep. 51.)  White felt the situation presented a "possible learning opportunity." (Id.)  White testified that Plaintiff was a good employee and his performance appraisals showed that there were "really no areas to improve on," since he scored "either average or above average on all of the markings."  (Id. at 52.)  White admitted, however, that he had not read O'Connor's investigation report. (Id. at 50-51, 141.)[3]

---

[3]   Plaintiff urges the Court to rely on White's testimony that he believed Plaintiff's termination had to do with his earlier complaints about "safety issues", despite White's

Plaintiff initiated this lawsuit with the filing of a complaint on June 4, 2010, in New Jersey state court.  He asserted claims of age discrimination in violation of the NJLAD and retaliatory termination in violation of CEPA.  Wackenhut removed the matter to this Court on the basis of diversity jurisdiction and subsequently filed the pending motion for summary judgment.

## II. STANDARD

Summary judgment shall be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).[4]  A fact is "material" if it will "affect the outcome of the suit under the governing law . . . ."  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  A dispute is "genuine" if it could lead a "reasonable jury [to] return a verdict for the nonmoving party."  <u>Id.</u>

---

acknowledgement that he did not read O'Connor's investigation report and did not actually know the reason for Plaintiff's termination.  (White Dep. 52, 141.)  The Court may not credit such speculation at summary judgment.  <u>Acumed LLC v. Advanced Surgical Servs., Inc.</u>, 561 F.3d 199, 228 (3d Cir. 2009).

[4] Pursuant to amendments to the Federal Rules of Civil Procedure in December 2010, the oft-cited summary judgment standard is now located in Rule 56(a) rather than 56(c).  Although the wording of the standard has changed slightly, replacing the word "issue" with "dispute", this change does not affect the substantive standard or the applicability of prior decisions construing the standard.  Fed. R. Civ. P. 56(a) advisory committee's note.

When deciding the existence of a genuine dispute of
material fact, a court's role is not to weigh the evidence: all
reasonable "inferences, doubts, and issues of credibility should
be resolved against the moving party." Meyer v. Riegel Prods.
Corp., 720 F.2d 303, 307 n.2 (3d Cir. 1983).  However, a mere
"scintilla of evidence," without more, will not give rise to a
genuine dispute for trial.  Anderson, 477 U.S. at 252.  In the
face of such evidence, summary judgment is still appropriate
"[w]here the record . . . could not lead a rational trier of
fact to find for the non-moving party." Matsushita Electric
Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).
"Summary judgment motions thus require judges to 'assess how
one-sided evidence is, or what a 'fair-minded' jury could
'reasonably' decide.'" Williams v. Borough of West Chester,
Pa., 891 F.2d 458, 460 (3d Cir. 1989) (quoting Anderson, 477
U.S. at 265 (Brennan, J., dissenting).

The movant "always bears the initial responsibility of
informing the district court of the basis for its motion, and
identifying those portions of 'the pleadings, depositions,
answers to interrogatories, and admissions on file, together
with the affidavits, if any,' which it believes demonstrate the
absence of a genuine issue of material fact." Celotex Corp. v.
Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P.
56(c)).  Then, "when a properly supported motion for summary

judgment [has been] made, the adverse party 'must set forth
specific facts showing that there is a genuine issue for
trial.'"  Anderson, 477 U.S. at 250 (quoting Fed. R. Civ. P.
56(e)).  The non-movant's burden is rigorous: it "must point to
concrete evidence in the record"; mere allegations, conclusions,
conjecture, and speculation will not defeat summary judgment.
Orsatti v. N.J. State Police, 71 F.3d 480, 484 (3d Cir. 1995);
Acumed LLC v. Advanced Surgical Servs., Inc., 561 F.3d 199, 228
(3d Cir. 2009) ("[S]peculation and conjecture may not defeat a
motion for summary judgment.").

### III. ANALYSIS

**A. NJLAD Claim**

Wackenhut moves for summary judgment on Plaintiff's age
discrimination claim under the NJLAD, arguing that Plaintiff is
unable to present any competent evidence of such discrimination.
Wackenhut contends that it has articulated a legitimate,
nondiscriminatory reason for Plaintiff's termination – his
handling of the checkpoint incident and poor performance as a
Team Leader.  Wackenhut further argues that Plaintiff is unable
to demonstrate that its proffered reason for the termination is
pretextual.  Plaintiff did not oppose this motion and has
apparently conceded it.  He has not set forth any evidence to
establish this claim and has therefore failed to satisfy his

burden at the summary judgment stage.  Accordingly, this claim is dismissed.

**B. CEPA Claim**

Plaintiff claims his termination constituted retaliation in violation of CEPA, N.J. Stat. Ann. § 34:19-3.  The New Jersey legislature enacted CEPA "to protect and encourage employees to report illegal or unethical workplace activities and to discourage public and private sector employers from engaging in such conduct."  Dzwonar v. McDevitt, 828 A.2d 893, 900 (N.J. 2003) (citing Abbamont v. Piscataway Twp. Bd. of Educ., 650 A.2d 958, 971 (N.J. 1994)).  CEPA is remedial legislation that must be construed liberally to achieve its important social goals.  Fleming v. Corr. Healthcare Solutions, Inc., 751 A.2d 1035, 1038-39 (N.J. 2000); Kolb v. Burns, 727 A.2d 525, 531 (N.J. App. Div. 1999).

To prevail on a CEPA claim, a plaintiff must prove four elements:

1) That he reasonably believed his employer's conduct was violating either a law, rule, or regulation promulgated pursuant to law, or a clear mandate of public policy;

2) That he performed a "whistle-blowing" activity as described in N.J. Stat. Ann. 34:19-3;

3) That an adverse employment action was taken against him; and

4) That a causal connection exists between the whistle-blowing activity and the adverse employment action.

Dzwonar, 828 A.2d at 900; Choy v. Comcast Cable Commc'ns, Inc.,
Civ. No. 08-4092, 2012 WL 253382, *8 (D.N.J. Jan. 26, 2012).

Since Plaintiff's CEPA claim depends on circumstantial
evidence, the Court applies the three-step, burden-shifting
analysis established in McDonnell Douglas Corp. v. Green, 411
U.S. 792 (1973).  Bocobo v. Radiology Consultants of S. Jersey,
P.A., -- F. App'x --, 2012 WL 1302576, *7 (3d Cir. Apr. 17,
2012) (citing Fleming, 751 A.2d at 1041).  At the first step of
the analysis, Plaintiff must establish a prima facie case of
retaliation.  Donofry v. Autotote Sys., Inc., 795 A.2d 260, 290-
91 (N.J. App. Div. 2001); Kolb, 727 A.2d at 531.  If the
plaintiff satisfies this burden, a presumption arises that the
employer unlawfully retaliated against him.  Choy, 2012 WL
253382 at *8.  The employer may rebut this presumption at the
second stage of the analysis by articulating some legitimate,
non-retaliatory reason for the termination decision.  Donofry,
795 A.2d at 292 (citing Bergen Commercial Bank v. Sisler, 723
A.2d 944, 955 (N.J. 1999)).  Although the burden of production
shifts to the employer at this second step, the burden of
persuasion remains at all times with the plaintiff.  Donofry,
795 A.2d at 292 (citing St. Mary's Honor Ctr. v. Hicks, 509 U.S.
502, 511 (1993)); Sisler, 723 A.2d at 955; Erickson v. Marsh &
McLennan Co., 569 A.2d 793, 799 (N.J. 1990)).  If the employer
sets forth a non-discriminatory reason for its employment

decision, the burden of production shifts back to the plaintiff, who now bears the ultimate burden of proving that he was subjected to retaliation.  Zive v. Stanley Roberts, Inc., 867 A.2d 1133, 1140 (2005); Donofry, 795 A.2d at 270; Choy, 2012 WL 253382 at *8.  The plaintiff may succeed at this third stage "either directly by persuading the court that a [retaliatory] reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence."  Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 256 (1981) (citing McDonnell Douglas, 411 U.S. at 804-05). In other words, the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could either (1) discredit the employer's articulated legitimate reasons or (2) believe that an invidious retaliatory reason was a motivating or determinative cause of the employer's action. Zive, 867 A.2d at 1144 (quoting Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994)).

### 1. **Prima Facie** Case

The elements of a prima facie case of retaliation under CEPA are the same as the plaintiff's ultimate burden of proof on the issue.  He must demonstrate that: 1) he reasonably believed that his employer's conduct was violating either a law, rule, or regulation promulgated pursuant to law, or a clear mandate of public policy; 2) he performed a "whistle-blowing" activity as

described in N.J. Stat. Ann. 34:19-3; 3) an adverse employment action was taken against him; and 4) a causal connection exists between the whistle-blowing activity and the adverse employment action.  Dzwonar, 828 A.2d at 900; Choy, 2012 WL 253382 at *8. Wackenhut argues that Plaintiff has failed to establish the first, second, and fourth prongs of his prima facie case.  The Court addresses each issue in turn.

### a. Reasonable Belief

As to the first prong, a CEPA plaintiff need not demonstrate that his employer "actually violated the law or a clear mandate of public policy" but simply that he "'reasonably believe[d]' that to be the case." Dzwonar, 828 A.2d at 900 (quoting Estate of Roach v. TRW, Inc., 754 A.2d 544, 552 (2000)).  Thus, the plaintiff need only "set forth facts that would support an objectively reasonable belief that a violation has occurred."  Id. at 901.  The plaintiff can satisfy this burden by demonstrating "a substantial nexus between the complained-of conduct" and the law, rule, regulation, or public policy.  Id.; Smith v. TA Operating LLC, Civ. No. 10-2563, 2010 WL 3269980, *3-4 (D.N.J. Aug. 17, 2010).  If the trial court finds such a nexus, a jury must then "determine whether the plaintiff actually held such a belief and, if so, whether that belief was objectively reasonable." Dzwonar, 828 A.2d at 901-02.

Plaintiff contends that he reasonably believed NRC
regulations required Wackenhut to have one Team Leader and four
ATLs (or five supervisors total), and its practice of staffing
Delta Team with only three ATLs was therefore unlawful.  He
cites to a federal regulation, which requires nuclear facilities
to have "[a]t least one supervisor of the security organization"
on site at all times.  10 C.F.R. § 73.50(a)(2).[5]  Since this
regulation governs precisely the complained-of activity,
Plaintiff has clearly satisfied his burden at this stage.  A
jury must now determine whether Plaintiff reasonably believed
that Wackenhut's staffing practice violated the NRC regulation.
The fact that Plaintiff was mistaken as to the specific number
of supervisors required and that Wackenhut was therefore not in
actual violation of the regulation is irrelevant.  Dzwonar, 828
A.2d at 900.  The goal of CEPA is "not to make lawyers out of
conscientious employees but rather to prevent retaliation
against those employees who object to employer conduct that they
reasonably believe to be unlawful or indisputably dangerous to
the public health, safety or welfare."  Id. at 901 (citing
Mehlman v. Mobil Oil Corp., 707 A.2d 1000, 1015-16 (N.J. 1998)).

---

[5] With respect to the armory issue, Plaintiff did not identify a
law, rule, regulation, or clear mandate of public policy, which
he believed had been violated by Wackenhut's system of
documenting its weapons.  Since he has therefore failed to
establish a prima facie CEPA claim as to his complaints
concerning this issue, the Court dismisses it accordingly.

### b. Protected Whistle-blowing Activity

Wackenhut next argues that Plaintiff did not engage in protected whistle-blowing activity under CEPA.  Wackenhut contends that the Court should ignore Plaintiff's affidavit regarding his whistle-blowing activities on the grounds that it is a sham.

Under the "sham affidavit" doctrine, a district court may disregard an affidavit that contradicts earlier deposition testimony if there is no adequate explanation for the conflict.  See EBC, Inc. v. Clark Bldg. Sys., Inc., 618 F.3d 253, 268 (3d Cir. 2010).  District courts may not, however, disregard affidavits merely because there is a discrepancy or "some degree" of conflict between them and earlier deposition testimony.  See Id. at 269 n.17; Baer, 392 F.3d at 624–45 (citing Kennett-Murray Corp. v. Bone, 622 F.2d 887, 894 (5th Cir. 1980), and Choudhry v. Jenkins, 559 F.2d 1085, 1090 (7th Cir. 1977) ("summary judgment was improper even though party's testimony was 'not a paradigm of cogency or persuasiveness,' inasmuch as it was not a 'transparent sham'")).  Thus, "not all contradictory affidavits are necessarily shams, and when there is independent evidence in the record to bolster an otherwise questionable affidavit, courts generally have refused to disregard the affidavit."  See EBC, Inc., 618 F.3d at 269

(internal quotations omitted) (citing <u>Jiminez v. All Am.</u>
<u>Rathskeller, Inc.</u>, 503 F.3d 247, 254 (3d Cir. 2007)).

Here, Plaintiff's deposition testimony and his affidavit
are not squarely in conflict.  In his deposition, Plaintiff
responded to questions concerning emails he had sent about the
understaffing issue:

> Q.   Did those other e-mails to Giselle Huckoby or Stephen
>      White raise safety issues?
> A.   Not that I recall, no.
> Q.   Did you raise safety issues to the NRC?
> A.   I did not.
> Q.   Did you ever raise safety issues to any kind of
>      mechanism within Wackenhut?
> A.   Just following the chain of command in the individuals
>      that I let know.
> Q.   As discussed in the emails that we already went
>      through.
> A.   Yes.
> Q.   Anything else?
> A.   No.

(Scull Tr. 242:18-243:13; Def.'s Ex. A.)  Defendant urges the
Court to interpret Plaintiff's testimony as indicating that he
did not raise any perceived safety issues of any kind with
Wackenhut other than sending certain emails.  The Court rejects
such a narrow reading of the testimony, which ignores
Plaintiff's statement that he informed individuals in "the chain
of command."  Plaintiff's affidavit elaborates on his testimony,
providing in relevant part, "I raised the issues of the armory
and staffing shortages to Steve White, my supervisor, and
Charles Workman, Mr. White's supervisor, approximately three

months before I was terminated." (Pl.'s Aff. ¶ 24.)  White's
deposition testimony corroborates this statement. (See supra
Part I; White Dep. 39, 41.)  Since Plaintiff's affidavit does
not clearly contradict his prior deposition testimony and is
bolstered by White's testimony, the "sham affidavit" doctrine
has no application here.

Accordingly, the Court credits Plaintiff's affidavit and
White's testimony, which establish that Plaintiff objected to
Wackenhut's staffing practice and threatened to report it to the
NRC, both protected activities under CEPA, N.J. Stat. Ann. §
34:19-3(a & c).

### c. Causal Connection

Defendant next argues that Plaintiff is unable to
demonstrate a causal connection between his alleged whistle-
blowing activities and his termination.  The Court disagrees.

To establish this casual link, a plaintiff usually must
prove either (1) an unusually suggestive temporal proximity
between the protected activity and the allegedly retaliatory
action, or (2) temporal proximity plus some additional evidence
of causation. Bowles v. City of Camden, 993 F. Supp. 255, 263-
64 (D.N.J. 1998); accord Hancock v. Borough of Oaklyn, 790 A.2d
186, 194 (N.J. App. Div. 2002) (citing Bowles for the
proposition that "[t]emporal proximity, standing alone, is
insufficient to establish causation"). Additionally, a "CEPA

24

plaintiff can prove causation by presenting either direct evidence of retaliation or circumstantial evidence that justifies an inference of retaliation."  Zaffuto v. Wal-Mart Stores, Inc., 130 F. App'x 566, 569 (3d Cir. 2005); see also Dominguez v. Costco Wholesale Corp., 356 F. App'x 611, 614 (3d Cir. 2009) ("A CEPA plaintiff can prove a causal connection through 'inferences that the trier of fact may reasonably draw based on circumstances surrounding the employment action.'").

The three-month gap between Plaintiff's whistle-blowing activity and his discharge does not by itself establish causation.  Choy, 2012 WL 253382 at *10 (rejecting inference of causation in CEPA case where three months passed between alleged whistle-blowing and termination); see also LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n, 503 F.3d 217, 233 (3d Cir. 2007), cert. den'd, 553 U.S. 1004 (2008) (a gap of three months between protected activity and retaliatory action "without more, cannot create an inference of causation and defeat summary judgment").

Plaintiff argues, however, that this three-month gap in addition to the circumstances surrounding his termination support an inference of causation.  Specifically, Plaintiff contends that O'Connor's report, which Wackenhut relied upon in terminating him, was clearly biased against him and contained untrue statements by the officers interviewed.  He cites to his own affidavit, in which he denies such misconduct, and an

25

affidavit by ATL Burgett-Frey, in which she avers that he was "a good supervisor", that she "never observed him hanging up the telephone on anyone" and that "he never acted unprofessional after the Philadelphia Phillies lost."  (Burgett-Frey Aff. ¶ 9.) Plaintiff also cites to White's testimony that Plaintiff was a "good" employee, whose performance appraisals showed that there were "really no areas to improve on", and that he should not have been disciplined for his handling of the checkpoint incident.  (White Dep. 52.)

Of course, whether the employer's decision was "wrong or mistaken" has little relevance here, since the proper inquiry is "whether discriminatory animus motivated the employer." Fuentes, 32 F.3d at 765.  The mere fact that Plaintiff disagreed with Workman's decision to fire him does not suggest retaliation.  Id.

The Court agrees with Plaintiff, however, that the circumstances surrounding his termination cast sufficient doubt on Workman's reasons for firing him as to suggest that Plaintiff's whistle-blowing activity just three months prior may have played a motivating role in the decision.  First, although Defendant attempts to insulate Workman's decision by claiming that he relied on O'Connor's "independent" report, the evidence suggests that the report was not impartial and that Workman was aware of its bias.  O'Connor's report itself states that when he

26

arrived at the Facility, he met with Tony Rizzo, the security

force union president, who informed him of the "issues" and

recommended that he "interview specific officers" because Rizzo

believed they "would open up and tell [O'Connor] about their

concerns." (O'Connor Report at 11-12.) Given the union's heavy

influence on this report, Plaintiff's argument that it was

biased against him is a plausible one.[6] Moreover, the report

itself highlights its one-sidedness, which calls into question

whether it actually motivated Workman's decision to fire

Plaintiff. For example, the report states,

> Most of the officers I interviewed mentioned Bob Scull
> hangs up on officers when they call him, but couldn't
> say who the officers were. Only Shari Stiles said Bob
> Scull just recently hung up on her. I believe if I
> interviewed [the] whole shift I would find others that
> experienced Bob hanging up on them. Bob Scull denies
> hanging up on them.

(Id. at 12 (emphasis added).) The report also indicates that

O'Connor did not interview any officers other than those

identified by the union. Workman testified that he relied on

the allegation that Plaintiff hung up on Stiles. When asked,

however, if he believed Stiles over Plaintiff, Workman testified

"I believe several officers have made those statements."

(Workman Dep. 77.) But as the report states, O'Connor could not

---

[6] Plaintiff argues that the officers interviewed by O'Connor
were biased against him because he had denied them overtime. It
is unclear from the record whether Workman was aware of this
fact.

identify any other officers whom Scull had hung up on.  Further, Workman testified that even though he knew Plaintiff had denied many of the findings in the report, he declined to interview Plaintiff because he "didn't think it was going to sway [his] decision one way or the other."  (Workman Dep. 88.)

The Court notes that the burden of establishing a <u>prima facie</u> case is not onerous.  <u>Neiderlander v. Am. Video Glass Co.</u>, 80 F. App'x 256, 261 (3d Cir. 2003) (citing <u>Burdine</u>, 450 U.S. at 253); <u>Bowles</u>, 993 F. Supp. at 264 (noting that burden of showing <u>prima facie</u> CEPA case is "relatively easy").  Construing the facts and all reasonable inferences in Plaintiff's favor, it appears Workman may have fired Plaintiff based on a report, which he knew to be biased and without giving Plaintiff the benefit of an interview to defend himself.  The Court views these facts in context, specifically, Plaintiff's twenty-year history with Wackenhut, his protected whistle-blowing activity just three months prior to his termination, his supervisor White's positive review of his work, and the fact that Workman and White both suggested that Plaintiff's handling of the checkpoint incident itself did not warrant his termination.  The totality of these circumstances raises a genuine factual dispute as to whether Plaintiff's whistle-blowing activity caused his termination.  Accordingly, Plaintiff has met his low burden at the <u>prima facie</u> stage.

**2. Legitimate, Non-Discriminatory Reason**

The burden of production now shifts to Wackenhut to articulate a legitimate, non-discriminatory reason for the employment decision. St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506-07 (1993). Wackenhut satisfies this light burden by citing to Plaintiff's alleged unresponsiveness to subordinates and mishandling of the checkpoint incident. Dunleavy v. Montville Twp., 192 F. App'x 100, 102 (3d Cir. 2006) (noting that employer's burden at second stage is "relatively light") (citing Fuentes v. Perskie, 32 F. 3d 759, 763 (3d Cir. 1994)).

**3. Pretext**

Plaintiff must now carry his ultimate burden of proving that these reasons are pretextual. To withstand summary judgment, he must point to some evidence, direct or circumstantial, from which a factfinder could either (1) discredit the employer's articulated legitimate reasons or (2) believe that an invidious retaliatory reason was a motivating or determinative cause of the employer's action. Zive, 867 A.2d at 1144 (citing Fuentes, 32 F.3d at 764). To satisfy the first Fuentes prong, which Plaintiff attempts to do here, he need only point to "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employers' proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence,' and hence

29

infer 'that the employer did not act for the asserted nondiscriminatory reasons.'" <u>Choy</u>, 2012 WL 253382, *4-5 (citing <u>Fuentes</u>, 32 F.3d at 765).  The plaintiff may satisfy this prong and establish pretext without citing anything beyond the evidence proffered to support his <u>prima facie</u> case.  <u>Fuentes</u>, 32 F.3d at 764.  That is the case here.

The Court views the facts collectively, as it must. <u>Abramson v. William Paterson Coll. of N.J.</u>, 260 F.3d 265, 276 (3d Cir. 2001) ("A play cannot be understood on the basis of some of its scenes but only on its entire performance, and similarly, a discrimination analysis must concentrate not on individual incidents, but on the overall scenario.").  Construed in Plaintiff's favor, he has established the following facts and inferences: (1) he worked for Wackenhut for twenty years, (2) he engaged in protected whistle-blowing activity just three months prior to his termination, (3) his supervisor, White, had given very positive reviews of his work, (4) Workman decided to fire him after the checkpoint incident, which even Workman suggested was not the grounds for the termination, (5) the report on which Workman allegedly relied in firing Plaintiff was biased in favor of the union and against Plaintiff, (6) Workman was aware of this bias, which was self-evident from the report, and (7) Workman did not interview Plaintiff before firing him, because he stated that it would not have "swayed" him anyway.

Given the totality of these circumstances, Plaintiff has shown just enough weakness and implausibility in Workman's proffered reasons for the termination to create a genuine factual dispute as to whether they are in fact pretextual. Moreover, a reasonable jury could conclude based on these facts that Plaintiff's whistle-blowing activity played a motivating role in the termination decision.  Accordingly, Plaintiff's CEPA claim may proceed to trial.

## IV. Conclusion

For the foregoing reasons, Wackenhut's motion for summary judgment is granted in part and denied in part.  An appropriate Order will issue herewith.

Date:  <u>May 24, 2012</u>                    <u>s/Renée Marie Bumb</u>
                                        RENEE MARIE BUMB
                                        United States District Judge

31