NOT FOR PUBLICATION

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

| | |
|---|---|
| ROBERT SCULL,<br><br>    Plaintiff,<br><br>    v.<br><br>THE WACKENHUT CORPORATION,<br><br>    Defendant. | Civil No. 10-4633<br>(RMB/AMD)<br><br><br>**SUPPLEMENTAL OPINION** |

Appearances:

Matthew S. Wolf
Melissa A. Schroeder
Matthew S. Wolf, Esquire, LLC
1236 Brace Road
2d Floor, Unit B
Cherry Hill, NJ 08034
    Attorneys for Plaintiff Robert Scull

John K. Bennett
Michael D. Ridenour
220 Headquarters Plaza
East Tower, 7th Floor
Morristown, NJ  07960
    Attorneys for Defendant The Wackenhut Corporation

**BUMB**, UNITED STATES DISTRICT JUDGE:

    The Court issues this supplemental opinion to further explain its oral ruling from the bench on June 21, 2013, dismissing as a matter of law Plaintiff's claim for punitive damages.

BACKGROUND

Robert Scull (the "Plaintiff") initiated this action against his former employer, The Wackenhut Corporation (the "Defendant" or "Wackenhut"), asserting claims for age discrimination in violation of the New Jersey Law Against Discrimination ("NJLAD"), N.J. Stat. Ann. § 10:5-1 et seq., and unlawful retaliation in violation of the New Jersey Conscientious Employee Protection Act ("CEPA"), N.J. Stat. Ann. § 34:19-1 et seq. This Court granted summary judgment with respect to Plaintiff's NJLAD claim but allowed the CEPA claim to proceed to trial. See Scull v. Wackenhut Corp., No. 10-4633, 2012 WL 1900573, at *7 (D.N.J. May 24, 2012).

The trial commenced on June 17, 2013 and testimony concluded on June 20. At the close of its case, Defendant moved for judgment as a matter of law under Rule 50(a)(2) inter alia as to punitive damages, asserting that, in the event the jury rendered a verdict in favor of Plaintiff, the evidence before the jury did not meet the high standard of proof necessary to permit an award of punitive damages. (June 21 Trial Tr. at 812-13.) The Court reserved its decision, and submitted the case to the jury subject to a later determination of the legal issues raised by Defendant's motion. (Id. at 814.)

The jury subsequently returned a verdict in favor of Plaintiff, and awarded back pay in the amount of $400,000 but declined to award front pay. Plaintiff then requested that the jury be allowed to determine whether to award punitive damages and, if so, what amount should be awarded.[1] Defendant referred the Court to its Rule 50(a)(2) motion for judgment as a matter of law. After hearing argument on the issue from both Plaintiff and Defendant, the Court ruled from the bench, granting Defendant's motion for judgment as a matter of law and dismissing Plaintiff's request for punitive damages. In so holding, the Court determined that the record contained no evidence of malicious, wanton or willful conduct on behalf of Defendant. The discussion below further expounds upon this ruling.

## DISCUSSION

Punitive damages are an available remedy for CEPA violations, but they "are available only in 'exceptional cases.'" <u>Victor v. State</u>, 952 A.2d 493, 506 (N.J. Super. App.

---

[1] Pursuant to the New Jersey Punitive Damages Act, N.J. Stat. Ann. 2A:15-5.9 <u>et</u> <u>seq.</u>, the jury did not consider punitive damages at the time that it determined liability and compensatory damages. <u>See, e.g.</u>, Gilvey v. Creative Dimensions in Educ., Inc., 2012 WL 3656332, at *5 (N.J. Super. App. Div. Aug. 28, 2012) ("A jury may not consider the issue of punitive damages until it has first decided that the defendant is liable and has awarded compensatory damages. Evidence relevant to the issue of punitive damages may not be

Div. 2008) (citing Catalane v. Gilian Instrument Corp., 638 A.2d 1341 (N.J. Super. App. Div. 1994)). They are not to be awarded as a matter of course in every case involving a CEPA violation. Cf. N.J. Stat. Ann. § 34:19-5 ("[T]he court or jury may order . . . punitive damages . . . ." (emphasis added)); Phillips v. Marriott Ownership Resorts, Inc., 2012 WL 5834442, at *13 (N.J. Super. App. Div. Nov. 19, 2012) (finding that defendant's retaliatory conduct was not sufficiently egregious to support a punitive damages award). The law recognizes that the purposes of punitive damages are different than the purposes of compensatory damages: "Punitive damages generally are intended not to compensate an injured party but to punish the tortfeasor and to deter him or her and others from similar conduct." Abbamont v. Piscataway Tp. Bd. of Educ., 650 A.2d 958, 970 (N.J. 1994) (citations omitted); Quinlan v. Curtiss-Wright Corp., 8 A.3d 209, 230 (N.J. 2010) ("Awards of punitive damages, as this Court has explained, serve particular purposes, which we have described as 'the deterrence of egregious misconduct and the punishment of the offender.'" (citations omitted)). The plaintiff bears the burden of proving by clear and convincing evidence that punitive damages are warranted in a particular

---

introduced in the first stage of the bifurcated trial." (internal citations omitted)).

case. N.J. Stat. Ann. § 2A:15-5.12; see also Phillips, 2012 WL 5834442, at *13.

The law clearly recognizes a "stricter standard" for imposing liability for punitive damages in CEPA actions. Dewelt v. Measurement Specialties, Inc., 2007 WL 542234, at *8 (D.N.J. Feb. 16, 2007). "[I]n CEPA actions, 'the employer should be liable for punitive damages only in the event of actual participation by upper management or willful indifference.'" Id. (citing Abbamont v. Piscataway Tp. Bd. of Educ., 650 A.2d 958, 964-65 (N.J. 1994)). This requires a greater threshold than mere negligence and punitive damages should be awarded "when the wrongdoer's conduct is especially egregious but only in the event of actual participation by upper management or willful indifference." Abbamont, 650 A.2d at 964; see also Lehmann v. Toys R' Us, Inc., 626 A.2d 445, 464 (N.J. 1993)).

The parties dispute whether or not Charles Workman constitutes Wackenhut's "upper management." The Court need not address this issue, however, as the evidence does not demonstrate that Workman acted in an especially egregious manner as is necessary to permit a punitive damages award.

The Supreme Court of New Jersey has set forth what constitutes "egregious" conduct:

> We have described the test for egregiousness as being satisfied if plaintiff has proven "an intentional wrongdoing in the sense of an 'evil-minded act' or an act accompanied by a wanton and willful disregard for the rights of [plaintiff]." In the alternative, we have found that the evidence will suffice if it demonstrates that defendant acted with "actual malice."

Quinlan, 8 A.3d at 230 (citations omitted); Phillips, 2012 WL 5834442, at *12. The court further pointed to four factors that should be considered in determining whether to award punitive damages: (1) the likelihood, at the relevant time, that serious harm would arise from the defendant's conduct; (2) the defendant's awareness or reckless disregard of the likelihood that the serious harm at issue would arise from the defendant's conduct; (3) the conduct of the defendant upon learning that its initial conduct would likely cause harm; and (4) the duration of the conduct or any concealment of it by the defendant. Quinlan, 8 A.3d at 230 (citing N.J. Model Civil Jury Charge 8.63).

    Plaintiff argues that Workman's conduct meets the standard for especially egregious conduct because he not only terminated Plaintiff in retaliation for Plaintiff's threats to inform the Nuclear Regulatory Commission about the shortage of assistant team leaders ("ATLs"), but he also ordered Brian O'Connor to conduct a "sham" investigation into Plaintiff's conduct as part of a conspiracy to terminate Plaintiff's employment. Plaintiff also contends that Workman then drafted an Employee Termination

6

Review form ("ETR") that contained numerous misrepresentations ostensibly with the purpose of fraudulently obtaining approval for Plaintiff's termination from other members of management. The evidence does not bear out these arguments.

### 1. Defendant's Investigation

The record is devoid of evidence suggesting that Workman acted in wanton and willful disregard of Plaintiff's rights or with actual malice in directing the investigation into Plaintiff's conduct. Workman testified that, after learning about certain comments made by ATL Eric Boos to Officer Bobbi Jo Whitaker in connection with the September 12, 2009 checkpoint incident, he decided to initiate an investigation into the incident and other allegations made regarding Plaintiff. (June 19 Tr. at 522.) Workman was concerned that security officers did not feel comfortable raising or discussing their own concerns with their supervisors, including Plaintiff. (Id.) Because Workman and Steven White, the interim Project Manager, wanted an objective investigator, Workman brought in Brian O'Connor, a process manager from another Wackenhut facility whose "specialty" was investigation of Safe2Say and SCWE issues. (Workman, id. at 524; O'Connor, June 20 Tr. at 640-41 (O'Connor's responsibilities included conducting and following up on Safe2Say, SCWE, or other investigations); White, June 20

Tr. at 705 (after the union complained about Boos' treatment of Whitaker, a unionized officer, White and Workman "decided to start an investigation on it and we decided that it would be better to bring an outside source in to do the investigation.").)

O'Connor also attested to his status as a neutral investigator, stating that he had never met Plaintiff prior to his arrival at the Salem-Hope Creek facility. (June 20 Tr. at 643.) O'Connor conducted an investigation during which he interviewed at least twelve employees and collected statements regarding the checkpoint incident as well as allegations that Plaintiff altered the logbook of overtime hours, hung up on security officers, and listened to baseball games on the radio. (See Ex. D-11 at 3.) Upon completion of his investigation on or about October 12, 2009, O'Connor drafted a report that summarized his findings and conclusions (the "O'Connor Report"). (June 20 Tr. at 659-60.)

Importantly, Workman testified that he did not instruct O'Connor to make any specific factual findings concerning any particular individuals but allowed O'Connor to conduct an independent investigation. (June 19 Tr. at 524.) In fact, Workman did not believe that he and O'Connor were on-site at Salem-Hope Creek at the same time. (Id. at 525-26.) O'Connor

8

supported these statements, and testified that he did not feel pressured or expected to produce any particular findings or conclusions. (June 20 Tr. at 643, 661, 662.) Plaintiff presented no evidence to dispute this testimony.[2]

Plaintiff relies heavily on the testimony of Bobbi Burgett-Frey, an ATL who worked with Plaintiff, as evidence that the O'Connor Report lacked a factual basis and therefore indicates that Defendant's entire investigation was mere pretense. Among the allegations investigated by O'Connor was an accusation that Plaintiff spent too much time listening to the baseball games and would be in a bad mood if the Philadelphia Phillies lost a game. (Ex. D-11 at 3.) O'Connor reported that five of the interviewees had mentioned that Plaintiff listened to the Phillies games in his office and one of them, Pat Meehan, reported that "[s]hift is afraid if the Phillies lose it will be a bad night." (Ex. D-11 at 6-8.) During the trial, Burgett-Frey testified concerning a "running joke" among the supervisors that if one of the supervisor's sports teams lost a game, then the supervisor would be in a bad mood for that day. (June 19 Tr. at

---

[2] Contrary to Plaintiff's implication, the evidence does not suggest a nefarious purpose for placing Plaintiff (and ATL Boos) on administrative leave pending the outcome of the investigation. Rather, Workman explained that he placed them on administrative leave because of his concern that, if it were true people did not feel comfortable raising issues to Plaintiff, then it

449.) This testimony cannot be interpreted as undermining the factual basis of the entire O'Connor Report and certainly does not constitute clear and convincing evidence of egregious conduct on the part of Workman.

First, Burgett-Frey's testimony specifically addresses only one of the four allegations that prompted Defendant's investigation.[3] (See Ex. D-11 at 3 (listing accusations that Plaintiff altered the log book of overtime hours, hung up on officers, and failed to support Officer Whitaker during the checkpoint incident).) Second, her testimony at most reflects disagreement with part of Meehan's interview statement but in no way can it support an inference that Meehan did not actually make that statement to O'Connor. Moreover, even if Meehan had falsely represented to O'Connor that Plaintiff's mood depended upon the outcome of the Phillies game, this fact could not support a finding of egregious conduct without clear and convincing evidence that Defendant knew the statement was false when made. The Court finds that no such evidence exists here.

---

would be difficult to bring out those issues while Plaintiff was on shift. (June 19 Tr. at 525.)

[3] As to the other allegations, she testified consistently with her interview statement regarding Officer Whitaker's acceptance of ATL Boos' apology, but she did not testify at all regarding the overtime issue. She also admitted that, because Plaintiff had his own office, she would not know whether he hung up on officers. (See June 19 Tr. at 448-49, 458-59.)

Third, the Court finds it of particular note that the O'Connor Report includes Plaintiff's comment to O'Connor as part of his interview statement that "the ATLs joke with me [Plaintiff] about this but it's not true." (Ex. D-11 at 10; see also id. at 13 (O'Connor listed among his findings and conclusions: "If the Phillies lose 'it's a bad day', the ATLs joke with Bob about this but he says it's not true.").) The inclusion of counterbalancing evidence reflective of Plaintiff's interpretation of events (and Burgett-Frey's testimony) significantly undermines the argument that Defendant engaged in a sham investigation as part of some conspiracy. Rather, it reflects an attempt to present both sides of the story and strongly suggests—or at least renders it plausible—that Workman reviewed both sides and simply rejected Plaintiff's explanation. Thus, this Court finds that the evidence concerning Defendant's conduct of the investigation cannot support a finding of egregious conduct.

The Court similarly rejects Plaintiff's attempts to point to other "irregularities" in the investigation, such as the union's involvement, from which it may supposedly be inferred in the aggregate that Defendant acted in an especially egregious manner in terminating Plaintiff's employment. The chain of inferences necessary to conclude that Defendant's conduct was

11

especially egregious are too attenuated to constitute clear and convincing evidence.

### 2. Employment Termination Review Form

In addition, the evidence does not demonstrate that Workman intentionally misrepresented Plaintiff's prior disciplinary history on the ETR so as to fraudulently obtain approval for Plaintiff's termination. The ETR described the events resulting in termination of Plaintiff's employment and identified the policies and procedures that Workman felt Plaintiff had violated. (June 19 Tr. at 530-32.) The form also included a section in which Workman could provide Plaintiff's prior disciplinary history. (See Ex. D-11.) In this section of Plaintiff's ETR, Workman explained that Plaintiff had received three prior written reprimands and had been suspended for three days. (Ex. D-13 at 2.)

Plaintiff specifically points to the first three disciplinary actions, which Workman described as "written reprimands" but which were actually verbal counseling sessions. (Workman, June 19 Tr. at 564-66.) Workman testified, "[t]o the best of my knowledge, they were accurate when I documented them," but he acknowledged that he now thought he had

12

"categorized one [or two] of them incorrectly in that section."[4] (June 19 Tr. at 563-66.) This testimony at most suggests that at the time he filled out the ETR Workman misinterpreted the paperwork associated with the prior disciplinary actions. (See id. at 565 ("A. The last one is a Step 2. Q. You think that the last one is a Step 2? A. Step 2, written disciplinary counseling, corrective action WF023 will be used as a written counseling document. It is a memo of record, it doesn't state oral counseling. Q. You think that Plaintiff's Exhibit 39 is a Step 2 written disciplinary counseling? A. In my opinion, yes.").) It cannot be inferred from this testimony that Workman intentionally misstated Plaintiff's disciplinary history.

The conclusion that Workman's misstatements were the result of an innocuous mistake is further supported by his testimony that Plaintiff's prior disciplinary history could not impact a decisionmaker's assessment of whether the termination should be approved. This is because Workman had classified Plaintiff's conduct as Level 1, which necessitated immediate termination

---

[4] Workman testified that he believed the third item reflected a Step 2 written disciplinary counseling action but acknowledged that a written reprimand must usually be signed and the form had no signature line. (June 19 Tr. at 565-66.) Whether or not he mistakenly categorized all three of them does not alter the Court's analysis.

13

regardless of prior discipline.[5] (Id. at 567-68.) Accordingly, even though the ETR misrepresented Plaintiff's disciplinary history, it cannot support a finding that Workman acted maliciously or with evil-minded intent because he knew at the time he drafted the ETR that this section would have no bearing on a reviewer's decision to approve the termination. In fact, Hunter Sawders, who administered Plaintiff's termination, testified that he did not rely upon the information contained in that section because prior disciplinary actions "didn't impact the determination." (June 20 Tr. at 741-42.) Had Workman truly misstated Plaintiff's disciplinary history with the intention of misleading the other decisionmakers into approving Plaintiff's termination, he would have classified the conduct as something other than a Level 1. See Phillips, 2012 WL 5834442, at *14 ("Even granting all reasonable inferences to plaintiff, we conclude a reasonable jury could not find, by clear and convincing evidence, that [Defendant's] behavior was malicious, or [Defendant] acted in wanton and willful disregard of plaintiff's rights, and [Defendant's] conduct was especially

---

[5] According to Workman, the section of the form designated for insertion of previous disciplinary actions was included on the form in the event that the decisionmaker did not classify the employee's conduct as Level 1. (Workman, June 19 Tr. at 568-69.) Both Workman and Sawders testified that this section was an administrative requirement but had no bearing in a Level 1 termination. (Id. at 569; Sawders, June 20 Tr. at 741.)

egregious. Consequently, judgment for defendant on plaintiff's punitive damages claim was warranted."); Donofry v. Autotote Systems, Inc., 795 A.2d 260, 269 (N.J. Super. Ct. App. Div. 2001) ("We are also satisfied that the judge properly dismissed plaintiff's claim for punitive damages, there being insufficient evidence of egregious conduct . . . ."); cf. Donelson v. DuPont Chambers Works, 2011 WL 5299583, at *9-10 (N.J. Super. Ct. App. Div. Nov. 7, 2011) (finding egregious conduct where plaintiff was subjected to pattern of retaliation that included disparaging emails or remarks, false accusations of misconduct, and demeaning reporting requirements inapplicable to other employees).

Therefore, this Court reaffirms its verbal decision to grant Defendant's motion under Federal Rule of Civil Procedure 50(a)(2) for judgment as a matter of law regarding Plaintiff's request for punitive damages on grounds that the Plaintiff cannot demonstrate through clear and convincing evidence that Defendant acted in an especially egregious manner. For this reason, the Court did not permit the jury to consider the issue of punitive damages.

Date: July 17, 2013

                                              s/Renée Marie Bumb
                                              RENÉE MARIE BUMB
                                              UNITED STATES DISTRICT JUDGE